LAW OFFICE OF
LEE PHILLIPS, P.C.
209 N. Elden Street
Flagstaff, Arizona 86001
(928) 779-1560
(928) 779-2909 Facsimile
leephillips@leephillipslaw.com
LEE PHILLIPS
State Bar No. 009540

Attorney for Plaintiffs Lula Stago
and Mary Rose Charley

Robert S. Malone
209 N. Elden Street
Flagstaff, AZ 86001
Arizona Bar No. 017352
bobsmalone@gmail.com
(928) 779-1560

Attorney for Plaintiff
Frieda Thompson

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| Lula Stago, Mary Rose Charley, Frieda Thompson, Plaintiffs, v. Office of Navajo and Hopi Indian Relocation, an administrative agency of the United States, Defendant. | No. COMPLAINT FOR JUDICIAL REVIEW |
|---|---|

...

## PRELIMINARY STATEMENT

1. This action is brought by Plaintiffs Lula Stago, Mary Rose Charley and Frieda Thompson to obtain judicial review of an administrative decision of the Office of Navajo and Hopi Indian Relocation (hereinafter "ONHIR") finding that Plaintiffs are not entitled to relocation assistance benefits pursuant to the Navajo-Hopi Settlement Act Navajo-Hopi Land Settlement Act, Pub. L. No. 93-531, §12, December 22, 1974, 88 Stat. 1716 (hereinafter, "Settlement Act"),[1] and the regulations and policies promulgated thereunder. Specifically, the agency found that Plaintiffs were not legal residents of the Hopi Partitioned Lands on or before December 22, 1973 and as of December 22, 1974 as required by the Act.

### I. Jurisdiction and Venue

2. This Court has jurisdiction over this action pursuant to 28 U.S.C. §1331, 5 U.S.C. §701, *et. seq.*, and the Settlement Act, Pub. L. No. 93-531 §12, December 22, 1974, 88 Stat. 1716, as this action is an appeal from an eligibility determination of Defendant ONHIR, an administrative agency of the United States. Plaintiffs have exhausted their administrative remedies.

3. Venue is proper in this District pursuant to Pub. L. No. 93-531 §15(g), December 22, 1974, 88 Stat. 1719, as amended by Pub. L. 100-666 §10, July 8,

---

[1] Formerly codified at 25 U.S.C. § 640d-14(c).

1980, 102 Stat. 3929, November 16, 1988, which directs that appeals of ONHIR eligibility determinations are to be brought in this Court.

## II.     Parties

4.     Plaintiffs are enrolled members of the Navajo Nation who were subject to relocation from their family's ancestral home on the Hopi Partitioned Lands (Herein after "HPL") as a consequence of the Settlement Act.

5.     Defendant, ONHIR, is an independent federal agency created by Congress pursuant to the Settlement Act to effectuate the relocation of members of the Navajo and Hopi tribes who resided on land partitioned to the tribe of which they are not members, and to provide relocation assistance benefits to all households required to relocate.

## III.     Facts

**Testimony of Lula Stago**

6.     Ms. Lula Stago submitted her application for relocation benefits on July 6, 2009.  In a letter dated November 19, 2010, ONHIR denied Ms. Stago's application based on a finding that she was not a resident of the HPL on December 22, 1974 as required by the Settlement Act.

7.     Ms. Stago filed a timely notice of appeal and an appeal hearing was conducted on December 20, 2013.  Ms. Stago now submits her Complaint and requests that the decision to deny her relocation benefits be reversed.

8. Ms. Stago was born December 12, 1944. Her family originally came from the Fingerpoint area north of the Jeddito Wash, an area of the Hopi reservation that was within what is known as District 6. In about 1947 the family was forced to move south to a location on what became the HPL on the south side of Jeddito Wash.

9. Ms. Stago lived with her mother, Lucille Dickson, her siblings including her sister Frieda Thompson, her aunt, Mary Rose Charley, her grandfather, Harris Chezumpena, and her grandmother, June Chezumpena.

10. Ms. Stago identified on a map provided by ONHIR the six HPL homesites she and her family occupied or used from 1947 until 1975. She identified site 6 which is just south of Jeddito Wash on the HPL as the homesite where she resided much of the time.

11. The large family cornfield was at site 6 along the edge of the wash. At the homesite there was a hogan and other structures. The hogan was traditional, recessed into the earth, supported by logs, and covered with mud. The family continued to graze north of Jeddito Wash while living at site 6.

12. Site 2, 3 & 4 belonged to Harris and June Chezumpena. Ms. Stago and Mary Rose Charley also stayed at this site at times, as did their cousins, David Johns, James John, Rose Calvin and Susie Yellowman. The distance between site 6

and sites 2, 3 & 4 was approximately 1½ miles. Ms. Stago's extended family's customary use area encompassed a large area on what became the HPL.

13.  Ms. Stago worked at Seba Delkai School and Ganado School as a student aide.  She purchased a vehicle and commuted daily to work from the HPL home.  Her two children stayed at home her mother and Mary Rose Charley.

14.  Ms. Stago enrolled in evening classes at Northern Arizona University (NAU) beginning in 1971, and commuting daily from the HPL homesites.  Her sister, Frieda Thompson, was also enrolled in evening classes and they travelled together to Flagstaff.

15.  In the fall of 1973 Ms. Stago enrolled in NAU full-time and lived in the dormitory during the school session, returning home to site 6 between terms and for holidays.  She earned her bachelor's degree in 1974 and her master's in 1975.

16.  Beginning in 1973 Ms. Stago's family was forced to move their livestock and establish a winter camp on the NPL, but continued to use their customary use area on the HPL and to return to site 6 every summer to farm.  The family continued to make use of the sites on the HPL, and to graze livestock there, into the year 1975.

17.  Lula Stago accompanied ONHIR officials Joseph Shelton and Bertha Begay on a field investigation to site 2, 3 & 4 in September, 2011.  Mr. Shelton

took pictures of the site and Ms. Stago identified the locations of the hogan and corral. She wanted Mr. Shelton to visit the other HPL homesites at sites 5 & 6 but he declined to do so.

**Testimony of Mary Rose Charley**

18. Mary Rose Charley submitted her application for relocation benefits on August 27, 2010. In a letter dated June 1, 2011, ONHIR denied her application, claiming she was not a resident of the HPL on December 22, 1974.

19. Ms. Charley filed a timely notice of appeal and a consolidated appeal hearing was conducted on December 20, 2013. Ms. Charley now submits her Complaint and requests that the decision to deny her federal relocation benefits be reversed.

20. Ms. Charley is 90 years old. Lucille Dickson was her sister and Lula Stago and Frieda Thompson are Lucille Dickson's children. Ms. Charley, like Ms. Stago, lived on the north side of the Jeddito Wash when she was younger and then later moved out of District 6 to the south side of Jeddito wash.

21. Ms. Charley lived south of Jeddito wash in an area called the "cornfield area" (site 6). She lived there with her children and her sister Lucille Dickson and her sister's children (Lula and Frieda), Harris and June Chezumpena and Charley Thompson lived just to the east (site 2, 3 & 4). There was a hogan with dirt over it, a shed and a tent and also a structure with legs that was used to

store the corn. Ms. Charley always lived with Lula Stago and her family since they were small.

22. Ms. Charley took care of Ms. Stago's children at the cornfield area (site 6) when Ms. Stago was going to NAU. Ms. Stago and Ms. Thompson would return home when they were not in school. Ms. Charley had an HPL grazing permit for many years. Once the permit was cancelled and the livestock reduction began, she moved her livestock to the NPL where a winter camp was established.

**Testimony of Frieda Thompson**

23. Frieda Thompson submitted her application for relocation benefits to ONHIR on October 13, 2009. In a letter dated July 2, 2012, ONHIR denied Ms. Thompson's application.

24. The reasons given by ONHIR for the denial of Ms. Thompson's application were that she does not appear in the BIA's enumeration; perceived discrepancies between Ms. Thompson's identification in her application of the location of her primary HPL residence on December 22, 1974 and Lula Stago's description of the location in a meeting with ONHIR's attorney prior to the appeal hearing; and statements made by Ms. Stago in the meeting with ONHIR's attorney regarding when her family last utilized the HPL sites.

25. Ms. Thompson timely filed a notice of appeal and appeared and testified at the consolidated appeal hearing.

26. Ms. Thompson was born July 30, 1952. At that time her parents were residing at a homesite south of Jeddito Wash. She testified to growing up at that homesite, designated site 6, and other sites in the area. At the hearing she indicated on a map the locations of those sites, placing all on the HPL. The homesites, cornfield, and grazing area were collectively considered to be her family's customary use area.

27. Ms. Thompson testified to the other family members who resided with her at site 6 and described the structures at the homesite.

28. Ms. Thompson graduated high school in 1971 and in the fall of that year began attending NAU. She attended NAU for two semesters, through spring, 1972, receiving full financial assistance from the Navajo Nation, including room and board.

29. Ms. Thompson spent the summer of 1972 at home at site 6 and in the fall of 1972 began working at Dilcon School. She had a car borrowed from sister Lula and from home to work until it got too muddy and she stayed at an apartment provided by the school.

30. Ms. Thompson worked at Dilcon School through the spring of 1973. In the summer of 1973 she was home, helping with planting and herding sheep. In the fall of 1973 she returned to NAU, again receiving full financial aid including room and board.

31. During the time she was attending NAU Ms. Thompson returned home between semesters and on many weekends. She traveled back and forth with her sister Lula who had a vehicle. Home continued to be the homesite designated as site 6.

32. Ms. Thompson's Social Security Statement shows earnings of $1,749 in 1972 and $3,061 in 1973 from her employment at Dilcon School. Her income was supplemented by the financial assistance received from the Navajo Nation to attend college. This income enabled Ms. Thompson to attain the status of head of household according to ONHIR's eligibility criteria prior to when she last utilized her HPL homesite after 1974.

**Testimony of Joseph Shelton**

33. Mr. Shelton, who worked for ONHIR, testified that Lula Stago, Frieda Thompson and Mary Rose Charley do not appear on the BIA Enumeration and the BIA maps do not show any improvements at the sites claimed by the applicants.

34. Mr. Shelton conducted a field investigation to site 2, 3 & 4 in September, 2011. He observed remnants of the hogan or some structure. The remnants looked like weathered lumber, and a few ash pits that would be associated with a homesite.

35. Mr. Shelton is familiar with traditional Navajo agricultural practices and agrees that site 6 would be a good place for a cornfield because it is in a flood plain.

36. Mr. Shelton reviewed the Declaration submitted by Harris Chezumpena on behalf of Mary Rose Charley. The Declaration stated that he lived one mile apart from Mary Rose Charley from 1960-1975 at a location "about 1.4 miles southeast of Jeddito Wash, 2 miles west of Nipple Butte". Mr. Shelton indicated that this location could be site 5 or site 2, 3 & 4.

**BIA Enumeration**

37. In 1975-1976 the Bureau of Indian Affairs ("BIA") conducted an enumeration of individuals and structures located on the HPL. Plaintiffs and their homesites were not identified as being located on the HPL according to the BIA enumeration. This fact was at the heart of the Independent Hearing Officer's ("IHO") decision to deny Plaintiffs' applications for relocation benefits despite Plaintiffs' consistent sworn testimony that they were residing on the HPL until 1975 or 1976.

38. At the time Plaintiffs testified at their administrative hearing on December 20, 2013, ONHIR and its witness Joseph Shelton were aware of, but failed to disclose, evidence that the BIA enumeration was not always accurate. Navajo individuals and their homesites were frequently missed by the BIA

enumerators due to the remote location of the homesite or because the homesite was not visible in aerial photographs taken by the BIA in 1974 as part of its enumeration of the HPL.

39. ONHIR and Mr. Shelton were aware that the BIA's own supervisor of the enumerators, Ms. Elsie Nez, had previously testified about why many families and their homesites were missed by the enumerators for a variety of reasons. According to Ms. Nez, in an undisclosed April 23, 1991 deposition, many HPL homes were missed on the aerial maps, especially mud hogans that "look like trees when you look through a microscope" at the map. The Plaintiffs' homesites had mud hogans, the type which are easily missed in aerial photographs. Ms. Nez testified this happened "all over the former Joint Use. I'd say you know 20, 30, you know lots."

40. There were no well-traveled roads to Plaintiffs' HPL homesites. The only vehicles that would have been at homesites would have been on weekends. According to Ms. Nez, enumerators normally only worked Monday through Friday. Therefore, homesites with no vehicles visible could have been missed. Ms. Nez testified that if a family had more than one homesite the enumerators were instructed to tell the family to select one as their primary homesite, "even though they may have spent equal amounts of time at both homes."

41.     Plaintiffs and their attorneys were unaware of Ms. Nez's deposition testimony at the time of their December 20, 2013 hearing.  As a result, Plaintiffs were unable to offer Ms. Nez's deposition testimony as possible reasons why they are not listed in the BIA enumeration.  Ms. Nez's deposition testimony would also have impacted the IHO's findings about the significance of the BIA enumeration.  ONHIR's failure to disclose Ms. Nez's deposition was a violation of its duty of candor toward the tribunal and its trust responsibility owed to the Plaintiffs.

**ONHIR Plan/Update**

42.     The ONHIR published a Plan Update in 1990 which defined residency for the purpose of relocation benefits.  It rejected "actual occupancy" as a requirement and instead chose "legal residency" as the operative definition.  Legal residency, according to the ONHIR, is:

> Where a person might be temporarily away, but maintained substantial, recurring contact with an identifiable homesite. This interpretation considered the fact that many persons would leave the partitioned lands temporarily to seek employment, job training, or other opportunities.  Yet, they maintained strong ties to their homes and community and *considered themselves* residents.

Id. (emphasis added).  The agency justified its choice of definition as follows:

> [T]he definition of legal residency best met both legal requirements and circumstances of life on the partitioned lands.  By reflecting the cultural traditions and economic realities of the people affected by relocation, this interpretation fulfilled the intent of Congress to provide for a thorough and generous program.

43. Congress mandated that the Settlement Act be implemented so as to "insure that persons displaced as a result of the Act are treated fairly, consistently and equitably so that these persons will not suffer the disproportionate adverse, social, economic, cultural and other impacts of relocation." 25 CFR §700.1(a).

**ONHIR'S Trust Responsibility**

44. "The United States Supreme Court has repeatedly recognized 'the distinctive obligation of trust incumbent upon the Government in its dealings with [Native Americans]." Bedoni v. Navajo-Hopi Indian Relocation Comm'n, 878 F.2d 1119, 1124 (9th Cir. 1989) (quoting Seminole Nation v. United States, 316 U.S. 286, 296, 62 S.Ct. 1049, 86 L.Ed. 1480, 96 Ct. Cl. 561 (1942)) (alteration in original) (citations omitted). This obligation is reflected in the ONHIR's own Plan Update that it is "the intent of Congress to provide for a thorough and generous [relocation benefit] program."

**The Independent Hearing Officer's Decision**

45. The IHO issued a single Decision on March 21, 2014, upholding ONHIR's denial of relocation benefits as to all seven applicants whose appeals were heard at the consolidated hearing.

46. The IHO's Decision contains "Credibility Findings Related to All Applicants," stating: "To the extent that any of the applicants testified that they resided in, used or visited areas of the Teesto Chapter … in the claimed area that

was partitioned for the use of the Hopi Indians, on or after December 22, 1974, that testimony is not credible."

47.    The IHO's blanket dismissal in a single sentence of the testimony of all Plaintiffs, together with that of the other four consolidated applicants, fails to provide the specific and cogent reasons legally required for an adverse credibility finding as to each witness who testifies at an administrative hearing.

48.    The IHO determined that all seven applicants testified untruthfully solely because they do not appear in the BIA's enumeration of residents of the HPL.  In the history of ONHIR's management of the relocation program numerous applicants who are not identified in the BIA enumeration have been found eligible for benefits and received relocation homes.

49.    The IHO noted in his Decision that ONHIR had certified Harris Chezumpena, who raised all four Plaintiffs, for relocation benefits and found that Mr. Chezumpena resided at the same homesites and "used the HPL area as late as 1976…" However, the IHO concluded that ONHIR's prior finding "is inconsistent with and contrary to the evidence shown in these appeals," of Plaintiffs and the other four applicants.

50.    The IHO also recognized that his prior decisions in the cases of two of Mr. Chezumpena's daughters had "found that the claimed areas were used in 1976 and 1977," but that "[f]rom the evidence presented in the instant appeals, to the

extent that the earlier findings are contradictory, those findings must be determined to have been improvident and are not controlling in these appeals."

51. The IHO made these determinations without offering a reason as to why his findings in two prior decisions, and the finding of ONHIR in the third case, should be disregarded.

52. Thus, the IHO summarily rejected all sworn testimony of Plaintiffs and the other witnesses for the sole reason that the HPL homesites they claim to have resided in are not recorded in the BIA enumeration when three other applicants received relocation benefits based upon residency at these same homesites.

53. In his Decision the IHO recognized that other applicants for relocation benefits have been found eligible despite having not been identified in the BIA enumeration at an HPL homesite but distinguishes those cases because of "the ability of the applicants to otherwise prove residence during the relevant time periods." (Emphasis in original.)

54. Left unstated in the IHO's Decision is the fact that with few if any exceptions the only way in which applicants have proven their residence on the HPL, despite their absence from the BIA enumeration, is through sworn testimony.

55. In his Decision the IHO engages in extensive speculation regarding reasons why Plaintiffs might have abandoned their HPL homesites prior to

December 22, 1974.  The IHO fails to reference testimonial or documentary evidence in support of these suppositions.

56. ONHIR issued Final Agency Action in Plaintiffs' cases on May 21, 2014, affirming the IHO's denial of relocation benefits.

57. Plaintiffs did not receive a fair hearing.  The IHO ignored without basis prior decisions recognizing the existence of the HPL homesites claimed, and rejected without reason all testimony of Plaintiffs and other witnesses.

58. The Administrative Hearing Record establishes that ONHIR's denial of Plaintiffs' claim for relocation benefits is arbitrary, capricious and an abuse of discretion; that it is not supported by substantial evidence; is not in accordance with applicable law; and that it occurred without observance of procedures required by law.

## IV.    Claims for Relief

59. Plaintiffs complain that Defendant ONHIR's eligibility decision to deny them relocation benefits, to which they are entitled as a matter of law, adversely affects them.

60. Further, that Defendant ONHIR's eligibility decision is arbitrary, capricious and an abuse of discretion.

61. Further, that Defendant ONHIR's eligibility decision is not supported by substantial evidence.

62. Further, that Defendant ONHIR's eligibility decision is not in accordance with ONHIR's fiduciary duty owed to the Plaintiffs and other applicable law.

63. And finally, Defendant ONHIR's eligibility decision occurred without observation of procedure required by law.

## V.     Prayer for Relief

WHEREFORE, Plaintiffs Lula Stago, Mary Rose Charley and Frieda Thompson pray that this Court:

(a) Assume jurisdiction over the matter;

(b) After judicial review, enter judgment holding the eligibility determination of Defendant ONHIR to be contrary to law and set it aside;

(c) Order the Defendant to issue a new determination that Plaintiffs are eligible for relocation assistance benefits and award those benefits to them; or in the alternative remand this matter for further proceedings.

(d) Award Plaintiffs costs and reasonably attorneys' fees pursuant to 28 U.S.C. §2412.

(e) Grant such other relief as this Court deems just and proper.

RESPECTFULLY submitted this 21st day of May, 2020.

*s/ Lee Phillips*
Lee Phillips
Attorney for Plaintiffs Lula Stago and
Mary Rose Charley

*s/ Robert Malone*
Robert Malone
Attorney for Plaintiff Frieda Thompson